[775 NYS2d 9]

ST. BARNABAS HOSPITAL, Respondent, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Appellant.

First Department, April 8, 2004

#### APPEARANCES OF COUNSEL

*Katten Muchin Zavis Rosenman (Peter F. Nadel, Joseph Zuckerman* and *Diane da Cunha* of counsel), for appellant.

*Garfunkel Wild & Travis, P.C. (Michael J. Keane* and *Elizabeth A. Dore* of counsel), for respondent.

#### OPINION OF THE COURT

FRIEDMAN, J.

The issue presented by this appeal is whether Supreme Court properly granted the motion by plaintiff St. Barnabas Hospital (St. Barnabas) to disqualify the law firm of Katten Muchin Zavis Rosenman (hereinafter, the Rosenman firm) as counsel to defendant New York City Health and Hospitals Corporation (HHC) in this action. The action concerns St. Barnabas's former affiliation with Lincoln Hospital, an HHC institution in the Bronx. The IAS court disqualified the Rosenman firm on the ground that, about a year before this action was commenced, the firm briefly represented St. Barnabas in a dispute with a billing vendor, Shared Medical Systems (SMS).

We conclude that the motion—which was not made until a year after the Rosenman firm first appeared for HHC in this action—should have been denied on the ground that St. Barnabas has waived the firm's alleged conflict of interest. Such waiver arises, not only from the unexplained delay in making the motion, but, more fundamentally, from St. Barnabas's express written consent to the firm's continuing adverse representation of HHC in matters concerning Lincoln Hospital—the very matters that are at issue in this lawsuit. St. Barnabas's consent to such adverse representation was given to the Rosenman firm two full years before the inception of the firm's brief representation of St. Barnabas in the SMS matter, from which the firm's conflict of interest in this action is said to arise. In view of these undisputed facts, the Rosenman firm's representation of HHC in this action cannot be said to create any appearance of impropriety. To fail to give effect to St. Barnabas's consent under these circumstances would constitute an unwarranted interference with a client's right to retain counsel of its choice, and with a law firm's ability to retain a longstanding client. Accordingly, we reverse the order of the IAS court, and deny the motion to disqualify the Rosenman firm.

*Factual Background*

Lincoln Hospital, as a unit of HHC, does not directly employ the physicians and other health care professionals who serve its patients. Such professionals are provided by an "affiliate" institution selected by HHC. In December 1996, HHC selected St. Barnabas to serve as Lincoln Hospital's affiliate for the period from July 1997 to June 2000.

The relationship between HHC and St. Barnabas with regard to Lincoln Hospital did not go smoothly. Although the affiliation became effective in July 1997, HHC and St. Barnabas apparently were never able to agree on all of the terms of the relationship. From April 1997 through September 1999, and then again from December 1999 to April 2001, the parties engaged in negotiations regarding the terms of the affiliation. The lengthy negotiations produced a September 1999 settlement agreement, and a May 2000 addendum to that agreement, but no final resolution of the parties' disputes. In all such negotiations, HHC was represented by the Rosenman firm, which has been HHC's outside counsel since 1976, and St. Barnabas was represented by Garfunkel Wild & Travis, P.C. (the Garfunkel firm), the same firm that represents St. Barnabas in this action.

HHC and St. Barnabas now characterize their negotiations concerning Lincoln Hospital differently. HHC describes the negotiations as contentious and, at times, even hostile. In contrast, St. Barnabas describes the negotiations as having been "amicable" up to the point this action was commenced. What cannot be disputed is that the negotiations, in which each party was advised by its own counsel, were adversarial and concerned matters of substantial disagreement between the parties, including the disputes at issue in the present lawsuit.

In March 1998—while the Rosenman firm was representing HHC in the Lincoln Hospital negotiations with St. Barnabas— St. Barnabas retained the Rosenman firm to represent it in certain employment litigation matters (hereinafter, the employment matters). The terms of this retention were set forth in a letter agreement between St. Barnabas and the Rosenman firm, dated March 4, 1998. As here relevant, the retention letter provides:

> "As you [St. Barnabas] know, we [the Rosenman firm] have represented [HHC] in connection with the Affiliation Agreement with St. Barnabas for the provision of health care services at the Institutions,

as therein defined [apparently referring to Rikers Island and Manhattan Detention Center], and will continue to do so with respect to any issue that may hereafter arise under that Agreement. *We are also representing [HHC] in connection with the current negotiations of a new Affiliation Agreement with St. Barnabas for health care services at Lincoln [Hospital].* Although we do not believe that any actual conflict of interest is presented by our present and future representation of [HHC] and our proposed retention by St. Barnabas with respect to employment matters, we request that you hereby consent to our representation of [HHC]. *Should we determine that an actual conflict of interest has arisen, we reserve the right to discontinue our representation of St. Barnabas, as to the particular matter in issue or generally, and to continue to represent [HHC]*" (emphasis added).

From the execution of the March 1998 retention letter until June 2002, the Rosenman firm represented St. Barnabas in 12 different employment matters. It appears from the record that these matters chiefly concerned discrimination, harassment and retaliation claims asserted against St. Barnabas by former employees. It is undisputed that none of these employment matters was substantially related to the disputes between HHC and St. Barnabas concerning Lincoln Hospital.

From March to May of 2000, while the Rosenman firm was still representing HHC against St. Barnabas in the Lincoln Hospital negotiations, the Rosenman firm represented St. Barnabas in a dispute with SMS, the aforementioned billing vendor.[1] St. Barnabas had retained SMS to bill for the services St. Barnabas physicians rendered at Lincoln Hospital. SMS complained that St. Barnabas was not paying SMS's invoices, while St. Barnabas claimed that SMS's collection efforts were deficient. In response to St. Barnabas's complaints about its collection efforts, SMS asserted that its collection difficulties were caused, in part, by HHC's alleged failure to provide SMS with full and accurate patient identification data. The provision of such data

---

1. In fact, the entity involved in the dispute with SMS was a billing subsidiary of St. Barnabas then known as Mid-Bronx Credit Corporation, and now named St. Barnabas Correctional Health Systems, Inc. Because the parties apparently agree that the distinction between St. Barnabas and its billing subsidiary is not significant to the disqualification motion, we refer to St. Barnabas and the billing subsidiary collectively as "St. Barnabas."

to the billing vendor was HHC's responsibility under the terms of St. Barnabas's affiliation with Lincoln Hospital.

It is undisputed that the vast majority of the Rosenman firm's three-month representation of St. Barnabas in the SMS matter was conducted by two former Rosenman attorneys, namely, David Ross, Esq. (then a Rosenman partner) and Alan Scheiner, Esq. (then a Rosenman associate). According to Ross, when he first met with St. Barnabas officials to discuss the SMS matter, he told them that the Rosenman firm had "represented [HHC] for a long time, that Lincoln was one of its hospitals, and that [he], Mr. Scheiner and the [Rosenman f]irm could not be involved in any matter that was adverse to HHC or Lincoln." Ross states that St. Barnabas's then-president, who was present at the meeting, responded that "he and his colleagues were well aware of the fact that the [Rosenman] firm represented HHC and he knew [that the Rosenman firm] could not be involved in anything adverse to HHC." St. Barnabas has not submitted any affidavit denying that this exchange took place.

In May 2000, SMS commenced a breach-of-contract action against St. Barnabas in federal court. At that point, the Rosenman firm withdrew from representing St. Barnabas in the SMS matter. As explained by Ross, the reason for the Rosenman firm's withdrawal was that St. Barnabas needed to consider joining HHC in the SMS action in order to litigate SMS's contention that HHC was not providing full and accurate patient data. Accordingly, St. Barnabas was defended in the SMS action by the Garfunkel firm, which, again, is the same law firm that had represented St. Barnabas in the Lincoln Hospital negotiations, and that now represents St. Barnabas in this action.[2]

After the Rosenman firm's withdrawal from its representation of St. Barnabas in the SMS matter, Ross and Scheiner, the two attorneys who had been principally responsible for that representation, left the firm. Ross left the firm at the end of August 2000, months before the commencement of the instant action, and Scheiner left the firm in the spring of 2001, either just before or just after this action was commenced.

On or about May 1, 2001, St. Barnabas, represented by the aforementioned Garfunkel firm, commenced this action against

---

2. Ultimately, St. Barnabas decided not to join HHC in the SMS action. Instead, St. Barnabas chose to litigate the claim that HHC had not provided full and accurate patient data, among other claims, in this separate action against HHC.

HHC by filing the summons and verified complaint with the Supreme Court, Bronx County. The complaint asserts, among other claims, that HHC breached its obligation to provide St. Barnabas with identification data for Lincoln Hospital patients that would enable St. Barnabas to bill successfully for the services of its physicians. The Rosenman firm appeared for HHC, and filed an answer, dated June 28, 2001, which, inter alia, asserts counterclaims for various alleged breaches by St. Barnabas of the September 1999 settlement agreement and the May 2000 addendum thereto. Settlement negotiations resumed in October 2001, and the action was allowed to lie dormant while such negotiations proceeded over the next several months. The negotiations broke down no later than April 4, 2002, when St. Barnabas served a document demand, interrogatories and a deposition notice. Thereafter, St. Barnabas served a second document demand on May 31, 2002.

On or about June 19, 2002, while the Rosenman firm was preparing to produce documents in response to St. Barnabas's demands (28,000 pages of documents were subsequently produced), St. Barnabas served a motion to disqualify the Rosenman firm as HHC's counsel in this action. The principal basis for the motion—which was made about 14 months after the action had been commenced, and about 12 months after the Rosenman firm had served HHC's answer and counterclaims— was the firm's representation of St. Barnabas in the SMS matter from March to May of 2000. In opposing the motion, the firm submitted, inter alia, the affirmation of Peter F. Nadel, Esq., the Rosenman partner principally responsible for representing HHC in the negotiations with St. Barnabas concerning the Lincoln Hospital affiliation, which stated:

> "Neither I nor, upon information and belief, any [Rosenman] attorney who was involved in the Lincoln negotiations or this litigation had any involvement whatsoever, or received any information of any kind concerning, the [Rosenman f]irm's representation of St. Barnabas in the employment or SMS matters. Conversely, no [Rosenman] attorney who worked on those matters had any involvement whatsoever in the Lincoln transaction or this litigation."

*The Decision of the IAS Court*

In the order appealed from, the IAS court granted the motion to disqualify the Rosenman firm based solely on the firm's three-

month representation of St. Barnabas in the dispute with SMS. Among other things, the court found that the SMS matter was substantially related to the Lincoln Hospital disputes at issue in this action; that St. Barnabas's consent to the Rosenman firm's continued adverse representation of HHC in the March 1998 retention letter could not be viewed as a "waiver of the protections of the attorney-client relationship" in litigation substantially related to the representation in the SMS matter; and that the disqualification motion was not barred by laches.

*Analysis*

Code of Professional Responsibility DR 5-108 (a) (1) (22 NYCRR 1200.27 [a] [1]) provides, in pertinent part, that "a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." The Court of Appeals has explained that "[a] party seeking disqualification of its adversary's lawyer pursuant to DR 5-108 (A) (1) must prove that there was an attorney-client relationship between the moving party and opposing counsel, that the matters involved in both representations are substantially related, and that the interests of the present client and former client are materially adverse" (*Jamaica Pub. Serv. Co. v AIU Ins. Co.*, 92 NY2d 631, 636 [1998]).

In this case, it is undisputed that the Rosenman firm previously had an attorney-client relationship with St. Barnabas with regard to several matters. Of these matters, the only one that St. Barnabas seriously contends to be "substantially related" to the Lincoln Hospital affiliation at issue in this action is the SMS matter. Although HHC argues that the SMS matter is not substantially related to this action, we find that St. Barnabas makes out a colorable claim that the matters are substantially related. In particular, St. Barnabas alleges in this action that HHC failed to fulfill its obligation to provide full and accurate patient identification data, thereby impairing St. Barnabas's ability to bill for the services of its physicians. As previously discussed, while the Rosenman firm was representing St. Barnabas in its dispute with SMS, SMS raised a substantially similar claim, namely, that the difficulties SMS was experiencing in collecting St. Barnabas's fees were due in part to SMS's receipt of inadequate patient identification data. Notably, HHC admits that SMS's assertion of the patient data claim in its ac-

tion against St. Barnabas created a potential conflict between St. Barnabas and HHC that required the Rosenman firm to withdraw from representing St. Barnabas in the SMS matter. Moreover, the same patient data claim against HHC that St. Barnabas could have litigated as a third-party claim in the SMS action is instead being litigated by St. Barnabas in this action.

Since it appears that the SMS matter is substantially related to at least some of the matters at issue in this action (and it is clear that the interests of HHC and St. Barnabas are now materially adverse), the next step in our inquiry ordinarily would be to consider whether HHC has made a sufficient factual showing to rebut the presumption that the existing Rosenman firm (after the departure of the attorneys primarily responsible for the SMS matter) is disqualified. As the Court of Appeals has held, where the attorneys who personally handled the prior representation have left the firm sought to be disqualified, the presumption of disqualification may be rebutted "by facts establishing that the firm's remaining attorneys possess no confidences or secrets of the former client" (*Solow v W.R. Grace & Co.*, 83 NY2d 303, 313 [1994]; *cf. Kassis v Teacher's Ins. & Annuity Assn.*, 93 NY2d 611, 617 [1999] [even where the attorney who personally handled a prior related matter for the movant is currently associated with the firm sought to be disqualified, "the presumption that the entirety of the attorney's current firm must be disqualified may be rebutted"]).

In this case, however, we find that the presence of an additional factor, one not present in either *Kassis* or *Solow*, obviates the need for a detailed factual showing to rebut the presumption of disqualification. We refer to the fact that St. Barnabas has waived, with knowledge of all relevant facts, any objection to the Rosenman firm's adverse representation of HHC in matters arising from St. Barnabas's former affiliation with Lincoln Hospital. This waiver has been accomplished both by St. Barnabas's express written consent to such representation in the March 1998 retention letter, and by St. Barnabas's delay of one year, from the time the Rosenman firm first appeared in this action, in seeking the firm's disqualification.

At the outset, we address St. Barnabas's argument that the Rosenman firm's adverse representation of HHC gives rise to such an "irreconcilable conflict" that St. Barnabas could not waive its objection to such representation, as a matter of law. This argument is without merit. Even in a matter substantially related to a prior representation, DR 5-108 (a) (1) forbids a

lawyer to represent interests adverse to a former client only where such representation is undertaken *"without the consent of the former client after full disclosure"* ([emphasis added]; *see also Schneider v Saiber Schlesinger Satz & Goldstein*, 260 AD2d 321 [1999]; *Yasuda Trust & Banking Co. v 250 Church Assoc.*, 206 AD2d 259, 259-260 [1994]; 2 Restatement [Third] of The Law Governing Lawyers § 122, Comment *g[iv]*, at 275 ["The professional rules and court decisions indicate that informed consent will always suffice (to remove disqualification) with respect to a former-client conflict of interest"]; *cf. Adams v Lehrer McGovern Bovis*, 208 AD2d 377, 377-378 [1994] ["absent a waiver by defendant," law firm employing attorney who had personally represented defendant was disqualified to act as plaintiff's counsel]). Thus, it is the privilege of the former client to determine, after full disclosure, whether or not to consent to the attorney's representation of an adversary in a matter related to the prior representation.

Contrary to St. Barnabas's arguments, *Greene v Greene* (47 NY2d 447 [1979]) does not stand for the proposition that effect can never be given to a former client's informed consent to its former counsel's representation of an adversary in a matter substantially related to the prior representation. *Greene* was a tort action against a law firm, in which the law firm representing the plaintiff included two partners (Grutman and Bjork) who were former members of the defendant firm. As former partners of the defendant, Grutman and Bjork were subject to joint and several liability for any damages the plaintiff, their current client, might recover in the action. Under these unusual circumstances, the Court of Appeals found the plaintiff's law firm disqualified to pursue the case, notwithstanding that the plaintiff had waived the conflict after full disclosure. The *Greene* court stressed that the personal interests of Grutman and Bjork were at odds with the interest of the plaintiff, their current client (47 NY2d at 452, citing Code of Professional Responsibility DR 5-101 [22 NYCRR 1200.20]), and, in addition, that the two lawyers, as former partners of the defendant firm, had a continuing fiduciary duty to the defendant, which had never waived the conflict (*id.* at 453). In this case, there is no issue of a conflict between the interests of the Rosenman firm and those of its present client (HHC), and, as more fully discussed below, the Rosenman firm's duty to refrain from representing interests adverse to St. Barnabas, its former client, has been effectively waived by St. Barnabas.

Having established that St. Barnabas was not in principle precluded from consenting to the Rosenman firm's representation of HHC in this action, we now turn to St. Barnabas's various arguments that, contrary to appearances, its execution of the March 1998 retention letter, and its delay in moving to disqualify the Rosenman firm, did not give rise to such consent. None of these arguments has merit.

Our starting point is the March 1998 retention letter itself. The plain terms of that letter flatly contradict any argument that the consent granted thereby does not extend to the Rosenman firm's representation of HHC against St. Barnabas in this action concerning the Lincoln Hospital affiliation. In this regard, the letter states that "[w]e [the Rosenman firm] are . . . representing [HHC] *in connection with the current negotiations of a new Affiliation Agreement with St. Barnabas for health care services at Lincoln [Hospital]*" (emphasis added). The letter goes on to request St. Barnabas's "consent" to the firm's continued representation of HHC, and states that, in the event "we [the firm] determine that an actual conflict of interest has arisen, we reserve the right to discontinue our representation of St. Barnabas, as to the particular matter in issue or generally, and *to continue to represent [HHC]*" (emphasis added). Thus, the letter specifically contemplates that, in the event a conflict of interest subsequently arose, the firm would withdraw from any affected representation of St. Barnabas (if not from representing St. Barnabas entirely), and would continue to represent HHC against St. Barnabas in connection with the previously referenced matters. This would include, it must be emphasized, the precise matter at issue in this action, namely, the Lincoln Hospital affiliation. Now that such a conflict has arisen, the retention letter, by its terms, signifies St. Barnabas's waiver of that conflict, and its consent to the Rosenman firm's continued adverse representation of HHC in matters relating to the Lincoln Hospital affiliation. As the IAS court aptly observed, "St. Barnabas cannot now compel the disqualification of HHC's counsel simply because the representation to which it consented has since devolved into litigation" (citing *Yasuda Trust, supra*).

St. Barnabas also argues that the retention letter waives only those future conflicts that might arise from the employment matters, for which St. Barnabas retained the Rosenman firm at the time the letter was executed, and not conflicts arising from the SMS matter, for which St. Barnabas did not retain the Rosenman firm until two years later. Although the IAS court

appears to have accepted this argument, we find it unavailing. The retention letter, by its terms, provides that the Rosenman firm's representation of HHC in connection with the Lincoln Hospital affiliation will continue in the event the firm "determine[s] that an actual conflict of interest has arisen." Thus, while the retention letter waives future conflicts only as to the Rosenman firm's adverse representation of HHC in the particular matters referenced therein (including the Lincoln Hospital affiliation), the letter does not limit the source of the future conflicts that St. Barnabas was agreeing to waive. The clear implication of the letter is that, in the event St. Barnabas subsequently retained the firm for additional matters, any conflict between such subsequent representations, on the one hand, and the firm's representation of HHC in connection with the Lincoln Hospital affiliation, on the other hand, would also be waived. Indeed, since the retention letter states that the parties did not anticipate that any conflicts would arise from the employment matters (and, so far as the record reflects, no conflicts have arisen from those matters), the letter recognizes the possibility that, in the future, St. Barnabas would retain the Rosenman firm for additional matters that might give rise to conflicts with the firm's representation of HHC.

At this juncture, it should be noted that St. Barnabas—a sophisticated, institutional client, and one obviously well-versed in dealing with attorneys—must be deemed to have been fully aware of the Rosenman firm's adverse representation of HHC in the Lincoln Hospital negotiations at the time (March 2000) it retained the Rosenman firm for the SMS matter. Again, the Lincoln Hospital negotiations were in full swing in March 2000, and, only two months later, produced the May 2000 addendum to the parties' earlier settlement agreement. Moreover, the affidavit of John P. Maher, who served as St. Barnabas's senior vice-president and treasurer at the relevant time, and had signed the March 1998 retention letter, reflects that Maher, at least, was fully conversant with both the Lincoln Hospital negotiations and the SMS matter. Significantly, it is also undisputed that, at the first meeting between Rosenman attorneys and St. Barnabas officials concerning the SMS matter, Ross, the Rosenman partner in charge of the representation, reminded the group—which included St. Barnabas's president—that the firm was representing HHC in the negotiations regarding Lincoln Hospital, and could not be involved in any matters adverse to HHC. Under these circumstances, if St. Barnabas did not intend,

at the time it retained the Rosenman firm for the SMS matter, for the retention letter's waiver provision to apply to conflicts arising from the SMS matter, St. Barnabas should have sought to have the retention letter amended accordingly.

St. Barnabas's final line of attack on the waiver set forth in the retention letter is to claim that the waiver should not be given effect in this case because the Rosenman firm purportedly did not make "full disclosure," as required by DR 5-108 (a) (1), before St. Barnabas retained the firm for the SMS matter in March 2000. St. Barnabas fails, however, to identify any material facts that were unknown to it at that time. St. Barnabas obviously had been aware of the Rosenman firm's adverse representation of HHC in the Lincoln Hospital negotiations since those negotiations commenced in 1997. It is equally obvious from the record that St. Barnabas was aware, at the time it retained the Rosenman firm for the SMS matter, that the dispute with SMS concerned billing for the services St. Barnabas provided at Lincoln Hospital and, therefore, could potentially involve HHC. To reiterate, it is undisputed that Mr. Ross of the Rosenman firm advised St. Barnabas, at the firm's first meeting with the hospital concerning the SMS matter, that the firm had been counsel to HHC for many years and could not become involved in any representation adverse to HHC. Finally, John Maher, the same St. Barnabas official who signed the retention letter containing the waiver, was, by his own sworn admission, heavily involved in dealing with the Rosenman firm in connection with the SMS matter. In sum, St. Barnabas had all the information it needed to make an informed decision when it chose to retain the Rosenman firm for the SMS matter (*see Lewis v Unigard Mut. Ins. Co.*, 83 AD2d 919, 920 [1981]).

In view of the foregoing, we have no doubt that the March 1998 retention letter constitutes an informed consent by St. Barnabas to the Rosenman firm's adverse representation of HHC in this action. Our conclusion that St. Barnabas has consented to the Rosenman firm's present role in this litigation is strengthened by the fact that St. Barnabas inexcusably waited about 14 months from the time this action was commenced— and about 12 months from the time the Rosenman firm served HHC's answer and counterclaims—before finally serving its disqualification motion. Contrary to St. Barnabas's arguments, the moving party's laches is a relevant consideration on a motion to disqualify counsel (*see Talvy v American Red Cross*, 205 AD2d 143, 153-154 [1994], *affd for reasons stated* 87 NY2d 826

[1995]; *Yasuda Trust, supra*; *Lewis v Unigard Mut. Ins. Co., supra*). Plainly, inordinate delay in moving for such relief is an indication that the motion has been made to gain a tactical advantage in the litigation, or for purposes of delay (*see H.H.B.K. 45th St. Corp. v Stern*, 158 AD2d 395, 396 [1990]; *Lucci v Lucci*, 150 AD2d 650, 652 [1989]). Courts have long "expressed concern that . . . disqualification motions may be used frivolously as a litigation tactic when there is no real concern that a confidence has been abused" (*Solow v W.R. Grace & Co.*, 83 NY2d at 310).

It is undisputed that St. Barnabas was fully aware, when it commenced this action and when the Rosenman firm first appeared for HHC herein, of all the facts on which it subsequently relied, a year later, in moving to disqualify the Rosenman firm. In deprecating the significance of this delay, St. Barnabas notes that the action was essentially "dormant" while the parties engaged in settlement discussions from October 2001 until April 2002. We observe, however, that St. Barnabas's evident willingness to have the Rosenman firm represent and advise HHC through six months of settlement discussions—discussions that concerned the very issues to be litigated in this action— completely contradicts the claim that St. Barnabas will be prejudiced by the firm's representation of HHC now that the action is being actively litigated. Moreover, the action was not completely "dormant" prior to the disqualification motion. The record shows that, before the motion was served in June 2002, the Rosenman firm expended 450 hours of attorney time in preparing HHC's answer and counterclaims, responding to two discovery requests (which involved the preparation of a 28,000-page document production), and otherwise preparing to litigate the case. Under all of the circumstances, we find that St. Barnabas's acquiescence in the Rosenman firm's representation of HHC during the entire first year of this action's pendency further establishes St. Barnabas's consent to such representation.

In determining that St. Barnabas has waived the Rosenman firm's alleged conflict of interest, we also find it significant that, notwithstanding St. Barnabas's protestations to the contrary, it appears rather unlikely that the firm's representation of HHC in this action will materially disadvantage St. Barnabas. It is undisputed that, as attested by Peter F. Nadel, Esq., of the Rosenman firm, there was no overlap in the firm's staffing of the Lincoln Hospital matters for HHC, on the one hand, and the firm's staffing of the SMS matter for St. Barnabas, on the

other hand. In other words, none of the attorneys who previously represented St. Barnabas in the SMS matter has participated in litigating this action or has otherwise been involved in representing HHC's interests against St. Barnabas in regard to the Lincoln Hospital affiliation. In this regard, it is significant that Rosenman is a large law firm. Moreover, the two Rosenman attorneys who conducted the vast majority of the representation of St. Barnabas in the SMS matter (Messrs. Ross and Scheiner) have both long since left the firm. We further note that the documents and information St. Barnabas shared with the Rosenman firm during the three-month representation in the SMS matter—which presumably concerned the processes used for the collection, storage and transmission of patient data for billing purposes—will likely be subject to discovery in this action, to the extent they are relevant to the matters in dispute.

We recognize, of course, that, on a disqualification motion, an attorney's "ethical obligation to avoid the appearance of impropriety" (*Kassis*, 93 NY2d at 616) is always an important consideration. In this case, we conclude that, under all of the relevant circumstances, no "appearance of impropriety" is created by the Rosenman firm's representation of HHC. Again, the Rosenman firm's appearance for HHC in this action simply continues the firm's prelitigation representation of HHC against St. Barnabas in connection with the Lincoln Hospital affiliation. That representation has been ongoing—and has been well known to St. Barnabas—since 1997, long before the firm's brief representation of St. Barnabas in the SMS matter. Thus, the Rosenman firm has never "switched sides" in the disputes between HHC and St. Barnabas; it has always been on HHC's side. In signing the March 1998 retention letter, St. Barnabas acknowledged, and expressly agreed, that the Rosenman firm would continue to represent HHC against St. Barnabas in matters relating to the Lincoln Hospital affiliation, notwithstanding St. Barnabas's limited retention of the firm. Moreover, it is undisputed that, upon subsequently being retained to represent St. Barnabas in the SMS matter, the firm specifically reminded St. Barnabas of the firm's relationship with HHC. In sum, given St. Barnabas's express and fully informed consent to the Rosenman firm's future representation of HHC in matters relating to the Lincoln Hospital affiliation, we do not believe that a reasonable observer would discern any impropriety in the Rosenman firm's continuing to represent HHC in such matters now that the parties' disputes have ripened into litigation.

Finally, we conclude, for the reasons stated by the IAS court, that the possibility that a Rosenman attorney might be called as a witness does not require the firm's disqualification.

Accordingly, the order of the Supreme Court, Bronx County (Albert J. Emanuelli, J.), entered December 24, 2002, which granted plaintiff's motion to disqualify the law firm of Katten Muchin Zavis Rosenman as counsel for defendant in this action, should be reversed, on the law and the facts, without costs, and the motion denied.

BUCKLEY, P.J., MAZZARELLI and MARLOW, JJ., concur.

Order, Supreme Court, Bronx County, entered December 24, 2002, reversed, on the law and the facts, without costs, and plaintiff's motion to disqualify the law firm of Katten Muchin Zavis Rosenman as counsel denied.